Filed 11/24/20  Paulek v. City of Moreno Valley CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

# FOURTH APPELLATE DISTRICT

# DIVISION TWO

| | |
|---|---|
| ALBERT PAULEK et al., | |
| Plaintiffs and Respondents, | E071184 |
| v. | (Super.Ct.Nos. RIC510967, RIC1511195, RIC1511279, RIC1511327 & RIC1511421) |
| CITY OF MORENO VALLEY et al., | |
| Defendants and Appellants; | OPINION |
| HF PROPERTIES et al., | |
| Real Parties in Interest and Appellants; | |
| (And four other cases.) | |

APPEAL from the Superior Court of Riverside County.  Sharon J. Waters, Judge.

(Retired judge of the Riverside Super. Ct. assigned by the Chief Justice pursuant to art.

VI, § 6 of the Cal. Const.).  Dismissed.

Earthjustice, Adriano L. Martinez and Oscar Espino-Padron Counsel for Plaintiffs

and Appellants Community Action and Environmental Justice, Center for Biological

Diversity, Coalition for Clean Air, and San Bernardino Valley Audubon Society and Sierra Club.

Lozeau Drury, Richard T. Drury and Brian B. Flynn for Plaintiff and Appellant Laborers' International Union of North America, Local 1184.

Shute, Mihaly & Weinberger, Kevin P. Bundy and Rachel B. Hooper for Plaintiff and Appellant Sierra Club.

Center for Biological Diversity and Aruna Prabhala for Plaintiff and Appellant Center for Biological Diversity.

Office of the City Attorney Steven B. Quintanilla and Martin D. Koczanowicz for Defendants and Appellants City of Moreno Valley and Moreno Valley Community Services District.

Cox, Castle & Nicholson, Kenneth B. Bley for Real Party in Interests and Appellants, HF Properties, Sunnymead Properties, Theodore Properties Partners, 13451 Theodore and HL Property Partners.

Frank G. Wells Environmental Law Clinic, Cara A. Horowitz and Julia E. Stein as Amicus Curia for Appellant.

Law Office of Susan Nash and Susan Nash for Plaintiffs and Respondents, Albert T. Paulek and Friends of the Northern San Jacinto Valley.

Blum Collins, Steven A. Blum, Craig M. Collins and Gary Ho for Plaintiff and Respondent, SoCal Environmental Justice Alliance.

Law Offices of Abaigail Smith and Abigail Smith for Plaintiff and Respondent Residents for A Livable Moreno Valley.

Xavier Becerra, Attorney General, Robert W. Byrne, Assistant Attorney General, Edward H. Ochoa, Sarah E. Morrison, Annadel A. Almendras, Randy Barrow, Gwynne B. Hunter Michael S. Dorsi and Heather C. Leslie, Deputy Attorneys General for California Air Resources Board as Amicus Curiae on behalf of Plaintiffs and Respondents.

I.

INTRODUCTION

The World Logistics Center (the Project) is a proposed "logistics campus" that would be built by 2031 on over 40 million square feet of undeveloped land in Moreno Valley (the City). In 2015, the Moreno Valley City Council certified a final Environmental Impact Report (EIR) for the Project and approved its construction.

Petitioners,[1] various individuals and environmental organizations, filed petitions for a writ of mandate under the California Environmental Quality Act (CEQA) (Pub. Res. Code §§ 21000 et seq.), challenging the EIR as inadequate in numerous respects. The trial court found the EIR was faulty for five reasons and granted the petitions in part, but rejected petitioners' remaining arguments.

We agree that Petitioners' appeal of the greenhouse gas (GHG) analysis issue is moot and therefore dismiss the appeal. We also exercise our discretion to dismiss the City's cross-appeal.

---

[1] Petitioners are (1) the Center for Community Action and Environmental Justice, Center for Biological Diversity, Coalition for Clean Air, Sierra Club, and San Bernardino Valley Audubon Society; (2) Albert Thomas Paulek and Friends of the Northern San Jacinto Valley; (3) Laborers' International Union of North America, Local Union No. 1184; (4) Residents for a Livable Moreno Valley; (5) California Clean Energy Committee; and (6) So Cal Environmental Justice Alliance.

## II.

## FACTUAL AND PROCEDURAL BACKGROUND

Highland Fairview[2] submitted its application for the Project in 2012. The City released a draft Environmental Impact Report (DEIR) for the Project, which found the Project would have a number of "significant" environmental impacts. After receiving public comments on the DEIR, the City released the EIR, which the City later certified and adopted.

Petitioners filed verified petitions for a writ of mandate challenging the EIR as inadequate under CEQA. The trial court ruled in petitioners' favor on five issues, finding that (1) the EIR failed to conduct a good faith analysis of potential sources of renewable energy for the Project; (2) the EIR improperly described an area near the Project as a "buffer zone"; (3) the EIR improperly analyzed the Project's noise impacts; (4) the EIR failed to determine whether the Project would have significant effects on farmland and how to mitigate those effects; and (5) the EIR's cumulative impacts analysis relied on outdated and incomplete information and failed to determine whether the Project's individual insignificant impacts were cumulatively significant. The trial court rejected Petitioners' remaining arguments, including that the EIR's GHG analysis was improper.

The trial court therefore granted Petitioners' writs of mandate in part, entered judgment in their favor, and awarded them attorney's fees. The trial court ordered the

---

[2] "Highland Fairview is a shorthand description of the Real Parties in Interest. It is not a legal entity."

5

City to vacate its approval of the parcel map associated with the Project and to proceed consistent with the trial court's orders in any subsequent CEQA review for the Project.

Petitioners appealed the trial court's upholding the EIR's GHG analysis. The City cross-appealed the trial court's finding that the EIR violated CEQA in five respects. In May 2020, we issued a tentative opinion in which we held that the EIR's GHG analysis violates CEQA and that the trial court incorrectly analyzed one issue, but affirmed the judgment in all other respects. In late July 2020, about two weeks before oral argument, the City moved to dismiss the appeal and cross-appeal as moot because (1) the City vacated the EIR and adopted a new one that uses a different GHG analysis, and (2) the City has complied with the trial court's orders granting petitioners' writ petitions.

III.

DISCUSSION

A. *Petitioners' Appeal Is Moot*[3]

The only issue Petitioners raise in their appeal is whether the trial court erroneously found that the EIR's GHG analysis does not violate CEQA. We conclude the issue is moot.

---

[3] Petitioners are joined by two sets of amicus curiae: (1) the Attorney General and CARB and (2) two professors from the Frank G. Wells Environmental Law Clinic at UCLA Law.

6

1. *Additional background*

a. *CARB's Cap-and-Trade Program*

Because the California Air Resources Board's (CARB) cap-and-trade program (C&T Program) is central to petitioners' appeal and the City's motion to dismiss, we outline it at the outset.

As part of the California Global Warming Solutions Act of 2006, also known as Assembly Bill No. 32 (AB 32), "CARB pursued a number of strategies for reducing greenhouse gas emissions.  One of those strategies was a cap-and-trade program, which CARB implemented by promulgating regulations in 2011.  [Citations.]"  (*Association of Irritated Residents v. Kern County Bd. of Supervisors* (2017) 17 Cal.App.5th 708, 734 (*AIR*).)

"'Cap-and-trade is a market-based approach to reducing pollution.  The "cap" creates a limit on the total amount of emissions from a group of regulated sources, and generally imposes no particular emissions limit on any one firm or source.'"  (*Association of Irritated Residents v. State Air Resources Bd.* (2012) 206 Cal.App.4th 1487, 1489 fn. 6.)  "'By establishing a declining, firm limit on the total pollution that can be released, a cap-and-trade program guarantees that the covered sources meet predetermined emissions targets.'  'The "trade" aspect of a cap-and-trade program creates an incentive for businesses to seek out cost-effective reductions, while also encouraging rapid action to reduce emissions quickly.'"  (*Ibid.*)

7

The purpose of the C&T Program is "to reduce emissions of greenhouse gases associated with entities identified in this article through the establishment, administration, and enforcement of the California Greenhouse Gas Cap-and-Trade Program by applying an aggregate greenhouse gas allowance budget on covered entities and providing a trading mechanism for compliance instruments." (Cal. Code Regs., tit. 17, § 95801.)

""""Compliance Instrument"" is defined as an 'allowance' or 'offset' issued by CARB or by an external trading system to which California's cap-and-trade program has been linked pursuant to the regulations. [Citation.] '"Allowance"' is a limited tradable authorization to emit up to one metric ton of $CO_2e$. [Citation.] An '"Offset credit"' is a tradable compliance instrument issued by CARB that represents a greenhouse gas reduction or greenhouse gas removal enhancement of one metric ton of [carbon dioxide equivalent].[4] [Citation.]" (*AIR*, *supra*, 17 Cal.App.5th at p. 734.)

California Code of Regulations section 95811 enumerates an exhaustive list of "covered entities" subject to the C&T Program, including various production facilities, suppliers of natural gas, fuel importers, and electricity generating facilities. These "entities receive allowances—either through auction, for free, or a combination of both— with each allowances representing the right to emit a ton of greenhouse gas emissions. At specified intervals, regulated businesses must surrender an allowance for each ton of GHG . . . pollution they release. Over time, the total amount of allowances available to

---

[4] Carbon Dioxide Equivalent "is a standard unit for measuring carbon footprints. It expresses the impact of each different greenhouse gas in terms of the amount of $CO_2$ that would create the same amount of warming."

8

all sources is reduced, meaning overall emissions from those sources must be also reduced. If an individual source does not need all of the allowances it has in a given period, it may "bank" those allowances to surrender later or sell them to another registered party. The ability to sell allowances to other businesses that need them creates a market price for pollution reductions and an incentive for businesses to achieve the maximum reductions possible at the lowest cost." (*Association of Irritated Residents v. State Air Resources Bd.*, *supra*, 206 Cal.App.4th at p. 1489, fn. 6.)

b. *The Project's EIR Process*

The DEIR used the South Coast Air Quality Management District (South Coast District) "significance threshold" of 10,000 metric tons for GHGs, meaning that the Project's GHG emissions would be "significant" if they exceeded 10,000 metric tons.[5] (See CEQA Guidelines, § 15064.7 subd. (a).) The DEIR found that the Project's expected annual GHG emissions would exceed 127,000 metric tons in 2014 and would incrementally increase each year until reaching 665,000 metric tons of carbon dioxide equivalent by 2022. The DEIR found that about 40 percent of the Project's GHGs would be emitted from trucks coming and going from the Project site in 2014, increasing to about 55 percent in 2022. The DEIR therefore found that the Project's GHG emissions would be "significant" because they would exceed the South Coast District's significance threshold of 10,000 metric tons.

---

[5] Petitioners do not challenge the Project's use of this significance threshold.

9

The DEIR outlined various state and federal GHG reduction strategies that the Project could implement to reduce its GHG emissions. The DEIR noted that one potentially strategy was the C&T Program, but determined that it was "[n]ot [a]pplicable" to the Project. The DEIR explained that "[l]arge industrial uses are the most likely source of participants for this program, *and it is not likely individual logistics warehousing will be an active participant in this program*." (Italics added.)

The EIR estimated that the Project's GHG emissions "at buildout" (i.e., when the Project is completed in 2031) would total about 416,000 metric tons per year.[6] The EIR designated about 95 percent of those emissions (396,754 metric tons) as "AB 32 capped emissions," whereas the remainder (19,237 metric tons) were designated as "Uncapped Emissions." The Capped Emissions would be emitted primarily from mobile sources (namely, "daily automobile and truck trips" to and from the Project) and electricity, while the remainder would be emitted by construction fuel, yard trucks, natural gas, generators, and forklifts. Uncapped Emissions would be emitted from waste, land use, refrigerants, and construction. GHGs associated with fossil fuels used for "vehicle miles traveled" (VMT) by vehicles to and from the Project would constitute "by far the largest source of [P]roject GHG emissions."

Like the DEIR, the EIR found that the C&T Program was "[n]ot [a]pplicable." The EIR explained that the C&T Program "covers products or services (such as

---

[6] This figure is based on a "reasonable" scenario. In a "worst case" scenario, the EIR estimated the Project would emit about 510,000 metric tons of GHGs.

electricity) and the cost of the cap-and-trade system would be transferred to the consumers. Large industrial uses are the most likely source of participants for this program, and it is not likely individual logistics warehousing will be an active participant in this program. Under AB 32, emissions from natural gas use, transportation fuel use, and electricity generation are covered under the cap-and-trade program and subject to the program's emission reduction requirements."

However, the EIR provided that "AB 32 capped emissions are shown for informational purposes, as those emissions are not compared with the . . . significance threshold." The EIR reasoned that GHGs from the combustion of fossil fuels "do not count" against the significance threshold because they are "subject to Cap-and-Trade requirements." The EIR therefore did not consider Capped Emissions in determining whether the Project's GHG emissions would have a significant impact. Instead, the EIR analyzed the effect of mitigation measures on the Uncapped Emissions and found that "the mitigated uncapped emissions" would be under the significance threshold.

The crux of Petitioners' appeal is whether the C&T Program applies to the Project and thus whether the EIR appropriately did not take Capped Emissions into account when determining whether the Project's GHG emissions would be significant.

c. *The Revised Final EIR*

In June 2020, the City adopted a resolution vacating the EIR and certifying a Revised Final EIR for the Project. The Revised Final EIR adopts "a new mitigation measure, Mitigation Measure 4.7.7.1.," in order to "address the significance of the

11

Project's GHG emissions without consideration of [the C&T Program] (capped emissions)." This mitigation measure requires the "Project's GHG emissions to be mitigated to net zero." To do so, the Project's developer must purchase "carbon offset credits" equal to the amount of the Project's GHG emissions.

### d. *The City's Motion to Dismiss Petitioners' Appeal*

The City moved to dismiss Petitioners' appeal as moot. The City argues the appeal is moot because the only issue it concerns is Petitioners' challenge to the EIR's consideration of the C&T Program to assess the significance of the Project's GHG emissions, but the Revised Final EIR does not consider the C&T Program. The City thus contends this court cannot grant Petitioners the only relief they seek—that the City not consider the C&T Program in its CEQA analysis—because the City no longer does so in the Revised Final EIR.

Petitioners opposed the motion, arguing that their appeal is not moot. They claim the Revised Final EIR continues to improperly rely on the C&T Program, and that the parties are currently litigating the issue in another case in the trial court. Petitioners alternatively argue that even if the appeal is moot, we should issue—and publish—our previous tentative decision, which we withdrew in light of the City's motion to dismiss, holding the EIR's GHG analysis violates CEQA. Petitioners urge us to do so in order to resolve an important issue of continuing public interest: "whether an EIR can rely on the [C&T Program] to dismiss the significance of GHG emissions for projects not subject to the [C&T Program]."

12

2. *Analysis*

An appeal is moot if events while the appeal is pending render it impossible for the appellate court to grant appellant effective relief. (*La Mirada Avenue Neighborhood Assn. of Hollywood v. City of Los Angeles* (2016) 2 Cal.App.5th 586, 590 (*La Mirada*).) Subsequent legislation can render a pending appeal moot. (*Ibid.*, quoting *Equi v. San Francisco* (1936) 13 Cal.App.2d 140, 141-142).) Because appellate courts will decide only actual controversies, "'an action which originally was based upon a justiciable controversy cannot be maintained on appeal if the questions raised therein have become moot by subsequent acts or events.'" (*La Mirada*, at p. 590, quoting *Finnie v. Town of Tiburon* (1988) 199 Cal.App.3d 1, 10).)

We conclude Petitioners' appeal is moot. As the City correctly notes—and Petitioners do not dispute—the only issue presented in Petitioners' appeal is whether the EIR properly relied on the C&T Program in its GHG analysis. The Final Revised EIR, however, replaced the EIR and does not use the C&T Program in its GHG analysis. The Final Revised EIR employs a new mitigation measure, not present in the EIR, "[t]o address the significance of the Project's GHG emissions *without consideration of*" the C&T Program. The Final Revised EIR therefore does not consider the C&T Program when evaluating the Project's GHG impacts.

Petitioners disagree. They claim that, much like the EIR, the Final Revised EIR still impermissibly relies on the C&T Program in its GHG analysis. In support, Petitioners cite a letter from CARB commenting on the Final Revised EIR in which

13

CARB states that the Final Revised EIR "continues to rely on" the EIR's faulty GHG analysis. CARB, however, does not cite anything from the Final Revised EIR to support its position. As noted, the Final Revised EIR unambiguously states that it "address[es] the significance of the Project's GHG emissions *without consideration of*" the C&T Program. Petitioners likewise do not point to anything in the Final Revised EIR that indicates it relies on the C&T Program in its GHG analysis.

Because the EIR has been vacated and the Final Revised EIR does not use the GHG analysis that the EIR does, we cannot grant Petitioners any effective relief related to the EIR's GHG analysis. Their appeal is therefore moot. (*La Mirada*, *supra*, 2 Cal.App.5th at p. 590.)

However, "there are three discretionary exceptions to the rules regarding mootness: (1) when the case presents an issue of broad public interest that is likely to recur [citation]; (2) when there may be a recurrence of the controversy between the parties [citation]; and (3) when a material question remains for the court's determination [citation]." (*Cucamongans United for Reasonable Expansion v. City of Rancho Cucamonga* (2000) 82 Cal.App.4th 473, 479 [Fourth Dist., Div. Two].) Petitioners argue the first and second exceptions apply here. We disagree.

Although we agree with the parties that Petitioners' appeal presents an issue of "broad public interest," nothing suggests it is "likely to recur" in future litigation. (See *Friends of Cuyamaca Valley v. Lake Cuyamaca Recreation & Park Dist.* (1994) 28 Cal.App.4th 419, 425 [public interest exception to mootness applies when appeal affects

the public interest "and there is reasonable probability that the same questions will again be litigated and appealed"].) The Final Revised EIR does not rely on the EIR's GHG analysis, and we are unaware of any entity that currently does so in its CEQA analysis or intends to do so in the future. (See *Cleveland National Forest Foundation v. San Diego Assn. of Governments* (2017) 17 Cal.App.5th 413, 424 ["continuing public interest" exception to mootness applied because decision on moot appeal would affect agency's current or future versions of EIR].) As it stands, Petitioners' concern that other agencies likely will use a GHG analysis like the EIR's is entirely speculative.

Petitioners also argue we should not dismiss their appeal as moot under the "recurrence of the controversy" exception to mootness. (See *Cucamongans United for Reasonable Expansion v. City of Rancho Cucamonga*, *supra*, 82 Cal.App.4th at p. 479.) Petitioners contend the issue of whether the EIR's GHG analysis was proper is likely to recur in the future because two other agencies, the South Coast District and the San Joaquin Valley Air Pollution Control District (San Joaquin District), have relied on the C&T Program to assess a project's GHG impacts.

There is scant evidence in the record about the South Coast District's alleged reliance on the C&T Program. The EIR briefly summarizes the South Coast District's two Negative Declarations from 2013 purportedly "stating that GHG emissions subject to the ARB Cap-and-Trade Program do not count against the 10,000 [metric ton of GHGs] significance threshold the [South Coast District] applies when acting as a lead agency." The EIR provides no further explanation or description of the Negative Declarations,

15

which are not in the record. Without more, we cannot determine whether the South Coast District has used a GHG analysis similar to that in the EIR. Further, Petitioners claim the EIR improperly relies on the C&T Program because the Project's GHG emissions are *not* subject to the C&T Program, and the South Coast District's Negative Declarations pertain to GHG emissions that *are* subject to the C&T Program. So whatever the South Coast District's GHG analysis entails, it is not the same as the EIR's GHG analysis.

The San Joaquin District's policy is no different. Its policy Petitioners allude to provides that "GHG emissions increases that are covered under ARB's Cap-and-Trade regulation cannot constitute significant increases under CEQA." Thus, like the South Coast District's policy, the San Joaquin District's policy contemplates GHG emissions that *are* subject to the C&T Program, whereas Petitioners challenge the EIR's reliance on the C&T Program because the Project's GHG emissions are *not* subject to the C&T Program.

In short, there is nothing in the record that suggests the EIR's allegedly faulty GHG analysis will be employed in the future. For that reason, the "continuing public interest" and "recurrence of the controversy" exceptions to mootness do not apply here.

Relying exclusively on *Monty v. Leis* (2011) 193 Cal.App.4th 1367 (*Monty*), Petitioners argue we should not dismiss their appeal "'in the interest of judicial economy.'" *Monty* does not help petitioners. In that case, the plaintiffs unsuccessfully sought a preliminary injunction to prevent a merger. (*Id*. at p. 1369.) "While the matter was on appeal, the transaction closed, rendering the petition for injunction moot." (*Ibid.*)

16

The *Monty* court declined to dismiss the appeal as moot because "the questions presented . . . remain[ed] at issue between the parties." (*Id*. at p. 1372.) It therefore made "no sense to return the matter to the trial court only to have the issues raised on appeal again." (*Ibid*.)

Here, the only issue presented in Petitioners' appeal is whether the EIR's GHG analysis violated CEQA. Because the City no longer relies on that analysis in the Final Revised EIR and the EIR was vacated, Petitioners' appeal does not present a live controversy between the parties. And because we cannot grant Petitioners any effective relief, we dismiss their appeal as moot.

B. *The City's Cross-Appeal*

The trial court found that the EIR was deficient in five respects. Shortly afterward, the City circulated a document titled, "Revised Sections of the Final Environmental Impact Report," in order to remedy the deficiencies in the EIR identified by the trial court.

The City nonetheless appealed the trial court's judgment "to protect [its] rights." The City now moves to dismiss its cross-appeal, arguing that it is moot because it has complied with the trial court's orders granting Petitioners' writ petition. Petitioners oppose the motion on the ground that the trial court, not this court, should decide whether the City has complied with its orders in the first instance.

We need not resolve the issue because we exercise our discretion to dismiss the City's cross-appeal. We construe the City's motion to dismiss its cross-appeal as a

17

request to dismiss under California Rules of Court, rule 8.244, subd. (c). An appellant may not dismiss an appeal as a matter of right. (*Huschke v. Slater* (2008) 168 Cal.App.4th 1153, 1160 [imposing $6,000 sanctions on attorney for unreasonable delay in notifying appellate court that parties had settled and dismissed the underlying case].) Rather, pursuant to California Rules of Court, rule 8.244(c)(2), "[o]n receipt of a request or stipulation to dismiss, the court *may* dismiss the appeal and direct immediate issuance of the remittitur." (Italics added.) Thus, dismissal is discretionary. We grant the request and dismiss the City's cross-appeal.

IV.

DISPOSITION

Petitioners' appeal and the City's cross-appeal are dismissed. Petitioners are awarded their costs on appeal as the prevailing parties. (Rule of Court, rule 8.278, subd. (a)(2).)

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

CODRINGTON
J.

We concur:

McKINSTER
Acting P. J.

MILLER
J.

18